Filed 6/13/25  In re T.H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re T.H., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>T.H.,<br><br>     Defendant and Appellant. | F088052<br><br>(Super. Ct. No. JV8383)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Tuolumne County.  Laura Leslie Krieg, Judge.

Candice L. Christensen, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*]     Before Detjen, Acting P. J., Peña, J. and Fain, J. [†]

[†]     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Rachelle Newcomb and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In a notice of appeal filed on behalf of minor T.H., she challenges the validity of the disposition entered following a contested jurisdictional hearing. However, the briefing filed with this court only addresses whether the juvenile court improperly concluded a pretrial statement by T.H. was not made during a custodial interview, and therefore, did not violate the requirements of *Miranda v. Arizona* (1966) 384 U.S. 436 and Welfare and Institutions Code[1] section 652.6. Following our review of the record on appeal, we affirm the findings made by the court.

## PROCEDURAL SUMMARY

On April 18, 2023, a section 602, subdivision (a) juvenile wardship petition was filed charging T.H. with attempted murder (Pen. Code, §§ 664/187, subd. (a), a felony; count 1), and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), a felony; count 2).[2] Count 1 contained a further allegation that T.H. personally used a deadly and dangerous weapon (Pen. Code, § 12022.7, subd. (b)(1)), while count 2 contained an allegation T.H. personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). On April 19, 2023, T.H. denied the charges and enhancements alleged against her in the petition.

A contested hearing on the charges alleged in the section 602 petition was held on November 1, 2023. Prior to this hearing, however, the juvenile court considered an Evidence Code section 402 motion brought on behalf of T.H. to suppress her prearrest

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise specified.

[2] At the time this petition was filed, T.H. was 15 years old.

statement.  The motion cited both *Miranda* and section 625.6.  After hearing testimony and oral argument, the court denied the motion, concluding T.H. was not in custody when the prearrest statement was made.  At the conclusion of the contested hearing, the court found true all the allegations contained in the juvenile wardship petition.

At the March 4, 2024, dispositional hearing, the juvenile court declared T.H. a ward of the court.  The court then committed T.H. to a secure youth treatment facility for a baseline term of five years.  On May 2, 2024, a notice of appeal was filed on T.H.'s behalf.

## FACTUAL SUMMARY

These background facts are taken from the testimony provided at the contested hearing addressing events occurring before T.H.'s prearrest statement was made.

P.C. testified that at approximately 7:45 a.m., on April 14, 2023, he heard a male voice yelling '[h]elp, help,' from a neighbor's front porch.  P.C. then discovered a man was lying on the ground and bleeding from his stomach.  P.C. told his wife to call 911.

L.C., who is T.H.'s mother, identified the man who was stabbed as her friend R.J., who had been staying in her house for a few days.  L.C. also noted that S.W., her son and T.H.'s half brother, was also in the house at the time R.J. was stabbed.  L.C. informed officers who responded to the scene she was not home at the time of the stabbing, having left around 6:50 a.m., to help a friend who had run out of gas.  L.C. testified that before she left the house, she searched for T.H. because she realized T.H. was not at home. When she was unable to locate her, L.C. left a note telling T.H. to contact her as soon as she returned home.  T.H. eventually texted her mother between 8:15 a.m. and 8:30 a.m., telling her she was home.  L.C. responded to the text telling T.H. to stay home until she returned.  However, when L.C. returned to the house, she discovered T.H. was no longer in the house.

Deputy Christian Favela responded to the call about the stabbing.  Favela described the scene at the time he arrived and first came into contact with the victim.

3.

About the same time Favela discovered the victim, S.W. stepped out of the house.  Favela immediately detained S.W. as a possible suspect.

While administering aid to the victim along with other law enforcement personnel, Favela noticed a knife lying next to the victim.  The victim informed Favela that he had pulled the knife out of his abdomen.  The victim was unable to identify who stabbed him.

During the contested hearing, detective Jon Hammell, who was in charge of the investigation, noted there had been a call reporting the stabbing at approximately 8:00 a.m.  Hammell testified he was familiar with the house because he had been there previously.  When Hammell arrived, S.W. was already detained and in the back of a patrol car, while L.C. was in the driveway.  Hammell observed that neither S.W. nor L.C. had any blood on their hands or clothing.  Hammell read S.W. his *Miranda* rights.  However, Hammell soon left the scene to meet up with T.H.

***Facts presented during the Evidence Code section 402 hearing***

When Hammell first arrived at the scene of the incident, T.H. was not present.  However, Hammell soon received information that T.H. contacted the Tuolumne County Sheriff's Office, and provided information about her location, stating "[s]he was involved in the incident that—the cause of the incident that we were investigating."  Hammell and another patrol officer then went to the designated location, which was on a nearby residential street.

When Hammell arrived, he asked the patrol officer to stay back while he talked to T.H.  Because he felt some concern about passing automobiles, Hammell instructed T.H. to sit on a rock that was out of the way.  Hammell started the conversation by telling T.H. that she was not under arrest or detained, then asked if she wanted to give a statement.  Hammell was wearing a body camera, and the following conversation was recorded and transcribed:

> "[HAMMELL]:  Hi [T.H.]. I'm … Hammell, um, from what I understand is you have some information that could help us with our investigation and,

uh, just so you know, we can come over here, out of the road so we don't get hit, is, you're not under arrest, you're not detained, anything like that, I wanted, basically you may be able to help with our investigation, and I would like to collect a statement from you if you're willing to give one ok, lets come over here maybe, I don't want to see any of us get hit by a car. Wanna take a seat on a rock or something?

"[MINOR]:  Sure.

"[HAMMELL]:  Ok.  So, if you wouldn't mind, just telling me what you can do to help me, or, what happened …

"[MINOR]:  Um …

"[HAMMELL]:  … from beginning to end.

"[MINOR]:  So, I came back from meeting my boyfriend from, at his bus stop.

"[HAMMELL]:  Mm-hmm.

"[MINOR]:  And, uh, my mom found out that I had sex with him and he, uh, she was really upset and she, uh, started yelling at me and, uh, basically, so I had a plan to kill my whole family and it didn't go as well as I thought it would.  And, um, basically [R. J.] was sleeping on the couch downstairs, and I knew that, uh, knew that, and so I took one of our kitchen knives and I stabbed him in his small intestine.  And from there I ran off into the woods.

"[HAMMELL]:  Ok.  Alright, ok, based on that information, uh, I'm gonna have you come over here, and hang out with our deputy, ok?"

When T.H. was finished providing this statement, Hammell escorted her to the patrol officer, who placed her in handcuffs and took her into custody.  Hammell stated T.H. was ultimately given a *Miranda* warning at juvenile hall.  No evidence was introduced about any further statements made by T.H. between the time she was taken into custody and later provided her *Miranda* rights at juvenile hall.

In his testimony during the Evidence Code section 402 hearing, Hammell noted that when he met T.H. on the residential street, he had no information she was involved in the stabbing because T.H. was not present when Hammell first arrived at the scene.  He

also reported that the initial comment T.H. made to the dispatcher at the sheriff's office only mentioned that she caused the incident and said nothing about being involved with the stabbing. Hammell felt T.H.'s statement that she was "the cause" could have a variety of meanings and that his purpose in talking to T.H. was to gather information.

## DISCUSSION

Again, the only issue addressed by the parties in their briefs concerns the validity of the juvenile court's ruling allowing T.H.'s prearrest statements to Hammell before she was taken into custody to be used in the contested hearing.

### I. The Potential Violation of T.H.'s *Miranda* Rights

#### A. Applicable Law

*Miranda* warnings are only required when police engage in questioning that is considered custodial. (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *People v. Ochoa* (1998) 19 Cal.4th 353, 401.) Someone is not "in custody" if a reasonable person in that same position would feel they could leave or simply end the questioning. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

"[W]e review a trial court's factual findings regarding the circumstances surrounding the interrogation for substantial evidence, and decide independently whether, 'given those circumstances, "a reasonable person in [the] [minor's] position would have felt free to end the questioning and leave." ' " (*In re Anthony L.* (2019) 43 Cal.App.5th 438, 445 (*Anthony L.*), citing *Leonard*.) An objective test must be applied when deciding whether a person is in custody, or more specifically, under arrest or restrained in their ability to move away from the questioning. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) Any consideration of this issue involves mixed questions of law and fact. (*People v. Moore* (2011) 51 Cal.4th 386, 395 (*Moore*).) When engaging in this analysis, we must look to the totality of the circumstances, including, but not limited to, who made the initial contact, where the contact occurred, and whether the individual being questioned was viewed as a witness or a suspect. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151,

1162.)  However, it is the prosecution's burden to prove the person being questioned was not in custody at the relevant time when the statement was made.  (*In re I.F.* (2018) 20 Cal.App.5th 735, 760.)

Because T.H. was 15 years old at the time of the events in this appeal, section 625.6 would have applied to any discussion that was categorized as "custodial." The language of this statute provides that *before* a custodial interrogation occurs, and before any *Miranda* rights can be waived, "a youth 17 years of age or younger *shall* consult with legal counsel in person, by telephone, or by video conference."  (§ 625.6, subd. (a), italics added.)  The totality of the circumstances approach, however, is still appropriate even when the interrogation involves a juvenile.  (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 533; see also *J.D.B. v. North Carolina* (2011) 564 U.S. 261.)  While courts recognize a minor's age might make him or her more susceptible to outside pressure or influence, they also recognize a minor "has the capacity to make a voluntary confession."  (*In re Jessie L.* (1982) 131 Cal.App.3d 202, 215; *In re Elias V.* (2015) 237 Cal.App.4th 568, 586−587.)  For this reason, the admissibility of statements made by a juvenile depends not only upon age, but on a "combination of that factor with other circumstances such as … intelligence, education, experience, and ability to comprehend the meaning and effect of [the] statement."  (*Jessie L.*, at p. 215.)

This analysis is more fully explained in *Anthony L.*, *supra*, 43 Cal.App.5th 438, which identifies the following factors as being "pertinent" to a resolution of the issue:

> " ' "[W]hether contact with law enforcement was initiated by the police or the person interrogated …; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the

interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.  [Citations.]  [¶]  No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." ' "  (*Anthony L.*, *supra*, 43 Cal.App.5th at p. 445.)

The juvenile court's factual findings regarding the circumstances surrounding the interrogation are reviewed using a deferential substantial evidence standard, and we independently decide whether a reasonable person would have felt free to end the questioning and/or leave.  (*Moore*, *supra*, 51 Cal.4th at p. 395.)

### B.    Application of This Standard to Our Facts

When ruling on the motion brought by T.H. to exclude the statement she made to Hammell, the juvenile court stated:

> "The law in our country, as it applies to both adults and juveniles, is that there is no right to have your *Miranda* rights read to you prior to an arrest.  So the police are not required to Mirandize or read you your *Miranda* rights prior to making that arrest or prior to a custodial interrogation, which is really the question here, as to whether or not the contact that day between … Hammell and the minor in this case rose to a custodial interrogation.

> "And so the Court has to look at the totality of circumstances.  And as the parties both cited the … *Anthony L.* case, which is 43 Cal.App.5th 438, it's a 2019 case, and it is a case where the Court talks about a noncustodial interview that was upheld .…  [¶]  …  [¶]

> "One of the factors I have to look at is was [T.H.] under arrest?  [¶] Well, … Hammell tells her she's not under arrest.  That's at least one thing he tells her when he contacts her, is that 'You're not under arrest.'  [¶]  The police are not the ones that initiate the contact.  [T.H.] calls.  And that particular fact was the one that really sort of complicated it for the Court, because [T.H.] calls to turn herself in and says, 'I was the cause of the incident.'  [¶]  …  [¶]

"When … Hammell contacts [T.H.]—and certainly the evidence shows this—there is no aggression. He's not confrontational in any way. He's not aggressive with her in any way. He has a very calm demeanor. So there's none of those elements that would make a minor or a reasonable person feel intimidated by him in any way or feel compelled that they need to answer his questions. The Court certainly didn't believe that.

"What the Court struggled with is whether or not [T.H.] was really a suspect at that point. And in reviewing the statements that 'I caused'—or 'I'm the cause of what happened,' I don't think that that rises to the level—and … Hammell indicated at that point they didn't know that [T.H.] was a suspect yet. They were still early in their investigation.

"I think about the scenario as if somebody walks into the police station and says, 'I want to turn myself in because I caused something that happened.' Well, the initial questions when they come out into the lobby to say, 'What are you talking about? What do you mean?' That's just not custodial interrogation.

"And that's sort of what we have here. Because at that point they don't know what [T.H.] even means by that statement, 'I'm the cause of what happened.' And so for that reason the Court is going to find that—in considering the totality of circumstances, that … Hammell did not need to read the *Miranda* rights to [T.H.], because she was not under arrest and she was not being interrogated in a setting that would require those rights to be read under the law.

"So, [defense counsel], the Court is going to deny your motion to exclude those statements." (Italics added.)

We believe this summary provided by the juvenile court of its rationale for denying the motion addresses a number of the factors laid out in *Anthony L.* were taken into consideration. Most importantly, law enforcement did not initiate the contact, and Hammell did not aggressively approach T.H. or try to coerce from her a specific response. T.H. was out in the open on a residential street, not restrained, and was only talking to one officer. The other officer who initially accompanied Hammell was specifically told to step back. A review of the transcript and the video is consistent with the conclusion the purpose of the interview was meant to clarify what information T.H. wanted to convey and what she meant when she said she was the cause of the incident.

As the court noted when making its findings, this phrase could have a variety of interpretations and was not necessarily a confession that T.H. stabbed the victim in this case at her family home. In fact, Hammell made this exact point during his testimony.

Factors left unaddressed by the juvenile court included information about how free T.H. may have felt to leave while she was talking to Hammell. While Hammell probably had some information about T.H.'s age, we do not know whether he had any knowledge about T.H.'s recent struggles.

Our independent review of the relevant transcripts and exhibits, as required by *Moore*, *supra*, 51 Cal.4th at p. 395, leads us to conclude T.H. did not appear to believe she was required to talk to Hammell. Again, she initiated the contact with the sheriff's office. At this point Hammell had no information T.H. was involved in the stabbing, since no witnesses, including the victim, placed T.H. at the house when the stabbing occurred. Furthermore, a review of the video from which this transcript was created provides no evidence of aggression by Hammell, either in his voice or movements, and that he had some concern about her safety given they were on the side of a road near a curve. Nor was there any "force," as suggested by defense counsel, in the suggestion that T.H. sit on a rock while giving her statement.

We are required under relevant case law interpreting *Miranda* restrictions, as they apply to juvenile witnesses, to look at the totality of the circumstances and not focus on one or two factors. (See *Anthony L.*, *supra*, 43 Cal.App.5th at p. 445.) Our review of the record leads us to conclude substantial evidence supports the juvenile court's findings on the admissibility of T.H.'s statement to Hammell. Any *Anthony L.* factors left unaddressed were not dispositive and do not require a reversal here. The interaction between Hammell and T.H. was not custodial when she provided the information about the stabbing, and *Miranda* rights were not triggered until she was taken into custody.

## DISPOSITION

The order rendered by the juvenile court in this matter is affirmed.